

U.S. Department of Justice

United States Attorney
Eastern District of New York

PTH:GSM
F. #2021R00235

271 Cadman Plaza East
Brooklyn, New York 11201

August 13, 2021

<u>By ECF and Email</u>

The Honorable James R. Cho
United States Magistrate Judge
United States District Court
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

   Re: <u>United States v. Ibn Cheatham a/k/a "GeeCrillz"</u>
     <u>Criminal Docket No. 21-422 (EK)</u>

Dear Judge Cho:

  The government respectfully submits this letter to request a permanent order of detention with respect to defendant Ibn Cheatham, also known as "GeeCrillz." On August 12, 2021, the defendant was charged by sealed indictment with kidnapping, committing physical violence in furtherance of an extortion, and possessing and brandishing a firearm during a crime of violence, in violation of Title 18, United States Code, Sections 1201(a)(1), 1951(a), 924(c)(1)(A)(i), and 924(c)(1)(A)(ii), respectively. He is scheduled to be arraigned before the Court today.

  The charges against the defendant arise from a February 2, 2021 incident in which the defendant invaded his victim's home, and then viciously beat, pistol-whipped, extorted, and kidnapped the victim. The defendant's attack caused the victim to suffer life-threatening injuries that required the victim to undergo an emergency craniotomy.

  As further described below, the nature of the charges against the defendant, the strength of the government's case, the defendant's extensive criminal history and the significant prison time he faces establish that the defendant poses a danger to the community and presents a serious risk of flight. In addition, because the defendant is charged with possessing and brandishing a firearm during a crime of violence, there is a presumption that "no condition or combination of conditions will reasonably assure the appearance of the [defendant] and the safety of the community." 18 U.S.C. § 3142(e)(3)(B). Accordingly, the defendant should be detained.

I. <u>Legal Standard</u>

 A. <u>Bail Reform Act</u>

  The Bail Reform Act empowers federal courts to order a defendant's detention pending trial where the government establishes by clear and convincing evidence that the defendant is a danger to the community or, by a preponderance of the evidence, that he represents a risk of flight. <u>See</u> 18 U.S.C. § 3142(e); <u>United States v. Ferranti</u>, 66 F.3d 540 (2d Cir. 1995); <u>United States v. Jackson</u>, 823 F.2d 4, 5 (2d Cir. 1987). Where, as here, there is probable cause to believe that an individual committed an offense under 18 U.S.C. § 924(c) (i.e., possessing and brandishing a firearm during a crime of violence), it shall be presumed that no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of the community. <u>See</u> 18 U.S.C. § 3142(e)(3)(B). Where a presumption of detention is applicable, the defendant bears the burden of rebutting that presumption by coming forward with evidence "that contradicts notions of flight risk or dangerousness." <u>United States v. Mercedes</u>, 254 F.3d 433, 436 (2d Cir. 2001).

  Moreover, it is well established that even if a defendant can meet his burden to rebut this presumption by coming forward with evidence that he does not pose a danger to the community or a risk of flight, the presumption favoring detention "does not disappear entirely, but remains a factor to be considered among those weighed by the district court." <u>Id.</u>; <u>see also</u> <u>United States v. Martir</u>, 782 F.2d 1141, 1144 (2d Cir. 1986) (presumption of risk of flight); <u>Rodriguez</u>, 950 F.2d at 88 (presumption of dangerousness).

  In order to determine whether the presumptions of dangerousness and flight are rebutted, the district court is directed to consider the factors enumerated in 18 U.S.C. § 3142(g), specifically: (1) the nature and circumstances of the crimes charged; (2) the weight of the evidence against the person; (3) the history and characteristics of the defendant, including family ties, employment, community ties and past conduct; and (4) the nature and seriousness of the danger posed by the defendant's release.

  Evidentiary rules do not apply at detention hearings and the government is entitled to present evidence by way of proffer, among other means. <u>See</u> 18 U.S.C. § 3142(f)(2); <u>see also</u> <u>United States v. LaFontaine</u>, 210 F.3d 125, 130-31 (2d Cir. 2000) (government entitled to proceed by proffer in detention hearings); <u>Ferranti</u>, 66 F.3d at 542 (same); <u>Martir</u>, 782 F.2d at 1145 (same). As the Second Circuit has explained:

> [I]n the pre-trial context, few detention hearings involve live testimony or cross-examination. Most proceed on proffers. <u>See</u> <u>United States v. LaFontaine</u>, 210 F.3d 125, 131 (2d Cir. 2000). This is because bail hearings are "typically informal affairs, not substitutes for trial or discovery." <u>United States v. Acevedo-Ramos</u>, 755 F.2d 203, 206 (1st Cir. 1985) (Breyer, J.) (quoted approvingly in <u>LaFontaine</u>, 210 F.3d at 131). Indeed,

> § 3142(f)(2)(B) expressly states that the Federal Rules of Evidence do not apply at bail hearings; thus, courts often base detention decisions on hearsay evidence. Id.

United States v. Abuhamra, 389 F.3d 309, 320 n.7 (2d Cir. 2004).

  B. <u>Elaborate Bail Packages Are Often Insufficient to Protect the Community Against Violent Defendants</u>

The Second Circuit has repeatedly stated that even elaborate conditions of home detention cannot substitute for incarceration where the defendant is violent or cannot be trusted to comply with the conditions of release. In <u>United States v. Millan</u>, the Second Circuit held that:

> Home detention and electronic monitoring at best elaborately replicate a detention facility without the confidence of security such a facility instills. If the government does not provide staff to monitor compliance extensively, protection of the community would be left largely to the word of [the defendant] that [he] will obey the conditions.

4 F.3d 1039, 1049 (2d Cir. 1993) (citation and internal quotation marks omitted). See also <u>United States v. Orena</u>, 986 F.2d 628, 632 (2d Cir. 1993) ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology") (internal quotation marks and citations omitted); <u>United States v. Tortora</u>, 922 F.2d 880, 886-87 (1st Cir. 1990) (elaborate conditions dependent upon good faith compliance were insufficient where the defendant's violent history provided no basis for believing that good faith would be forthcoming).

Similarly, courts in this district have denied dangerous defendants bail in recognition of the Second Circuit's dim view of the effectiveness of home detention and electronic monitoring. See e.g., <u>United States v. Cantarella</u>, No. CR02-0307, 2002 WL 31946862, at *3-4 (E.D.N.Y. Nov. 26, 2002) (Garaufis, J.) (adopting "principle" of "den[ying] bail to 'dangerous' defendants despite the availability of home detention and electronic surveillance and notwithstanding the value of a defendant's bail package"); <u>United States v. Agnello</u>, 101 F. Supp. 2d 108, 116 (E.D.N.Y. 2002) (Gershon, J.) ("[T]he protection of the community provided by the proposed home detention remains inferior to that provided by confinement in a detention facility[.]"); <u>United States v. Masotto</u>, 811 F. Supp. 878, 883 (E.D.N.Y. 1993) (rejecting bail because "the Second Circuit appears to be saying to us that in the case of 'dangerous defendants' the Bail Reform Act does not contemplate the type of conditions suggested by this Court [including home confinement and electronic monitoring] and that, even if it did, the conditions would not protect the community, given the ease with which many of them may be circumvented").

3

II.     Proffered Facts

Detailed below is a proffer of the relevant facts in support of the government's position with respect to the pretrial detention of the defendant. See LaFontaine, 210 F.3d at 130-31. The proof in this case consists of witness testimony; records of electronic and telephone communications; recorded telephone calls and cellular telephone location data; records from Cash App,[1] Uber Technologies, Inc. ("Uber") and Lyft, Inc. ("Lyft"); bank and automated teller machine ("ATM") records; a seized firearm and ammunition; and other evidence.

   A.   February 2, 2021 Armed Home Invasion Extortion and Kidnapping

The indictment returned in this matter is the result of an ongoing investigation by the United States Attorney's Office and the Federal Bureau of Investigation, into a violent home invasion extortion and kidnapping perpetrated by Ibn Cheatham in Staten Island, New York on February 2, 2021.

On January 29, 2021, defendant Cheatham sold narcotics to the victim ("John Doe") in person in Newark, New Jersey. During the sale, Cheatham provided his cell phone number to John Doe to call for future drug purchases.

After arranging a second sale by phone, on approximately January 31, 2021, Cheatham drove, with his girlfriend, from New Jersey to the victim's home in Staten Island, New York, where Cheatham sold John Doe narcotics.

Finally, after coordinating a third sale by phone on approximately February 1, 2021, Cheatham used his Uber account to arrange a ride from New Jersey to the victim's home in Staten Island. Cheatham arrived at John Doe's home at approximately 1:47 a.m.[2] on February 2, 2021 and sold John Doe heroin and Xanax. John Doe attempted to pay Cheatham $250 (payment for the drugs and Cheatham's transportation) via a Cash App payment to Cheatham's Cash App account. At that time, John Doe believed that the Cash App payment to Cheatham had gone through. However, it was later revealed that the payment had been automatically blocked.

Following the February 2 drug sale and the attempted Cash App payment, Cheatham used his Lyft account to arrange a ride from John Doe's home back to Newark, New Jersey. Cheatham was picked up at approximately 2:45 a.m. and dropped off in New Jersey at approximately 3:22 a.m.

---

[1] Cash App is a mobile payment application through which users can send money to, and receive money from, others by entering the other transaction participant's "$cashtag," telephone number, or QR code into the application. See "Cash App," available at https://cash.app/.

[2] All times cited are in Eastern Standard Time.

4

From approximately 3:36 a.m. to 4:17 a.m., Cheatham placed more than a dozen outgoing calls to John Doe. However, John Doe had ingested the Xanax Cheatham sold him and was fast asleep.

Then, Cheatham used his Lyft account to order another ride from New Jersey to the victim's home in Staten Island, New York. The Lyft driver picked Cheatham up in Newark, New Jersey at approximately 4:35 a.m. and, as corroborated by cellular telephone location data for Cheatham's cell phone, arrived back at John Doe's home at approximately 5:00 a.m. on February 2, 2021.

Cheatham initially pounded on the front door to John Doe's home, yelling, in sum and substance, "Police! Open the door!" This awoke John Doe's girlfriend ("Jane Doe"), who then awoke John Doe. However, before John Doe and Jane Doe could react, Cheatham broke through both the vestibule door and the front door to their home. Once in the home, Cheatham began punching and pistol-whipping John Doe on the nose and on the top of John Doe's head with the handle of a small handgun. As he beat John Doe, Cheatham indicated that he had repeatedly attempted to contact John Doe because the Cash App payment John Doe had sent did not go through.

Once Cheatham finished beating John Doe with both the gun and Cheatham's fists, Cheatham racked the slide of the gun and told John Doe to wipe his face clean and to go with Cheatham to an ATM to retrieve money to pay Cheatham. Cheatham also told Jane Doe, in sum and substance, not to call anyone and that if she called the police he would come back and kill her and her family. Cheatham and John Doe then got into the Lyft vehicle, which was still waiting outside, and drove to a nearby convenience store, where John Doe withdrew approximately $400 from an ATM and gave Cheatham $380. Cheatham then left in the Lyft vehicle and was dropped back off in Newark, New Jersey at approximately 5:54 a.m.

Several days later, John Doe attempted to voluntarily commit himself to a detoxification program in Staten Island. However, as he was checking in, the receptionist noticed "white goo" leaking from John Doe's nose and called an ambulance. John Doe subsequently lost consciousness and underwent emergency surgery. Medical records reveal that John Doe's nose was broken and that he had suffered a subdural hematoma, also known as a "brain bleed." To save John Doe's life, doctors performed an emergency craniotomy, cutting open John Doe's skull to remove the hematoma. Following the craniotomy, John Doe was put into a medically induced coma and had approximately 70 surgical staples applied to his head.

Thus, not only did Cheatham extort and kidnap John Doe over a small drug debt, but he also beat and pistol-whipped John Doe so viciously that it caused life-threatening injuries. In addition, Cheatham carried out the home invasion and attack while John and Jane Doe's children – a two-year old and an older disabled child who is non-verbal – were present in the home.

B. February 25, 2021 Possession of a Loaded Semi-Automatic Pistol

On February 25, 2021, several weeks after the home invasion extortion and kidnapping, Montclair Police Department officers responded to a report of a burglary in Montclair, New Jersey. It was also reported that the individual suspected of the burglary had subsequently left the site of the burglary in the back seat of a silver sedan. When officers arrived at the scene, they stopped a silver taxi matching the description. The taxi's passenger was the defendant, Ibn Cheatham.

Following initial questioning, Cheatham was removed from the taxi and was frisked. During the frisk, officers found a small loaded semi-automatic pistol hidden in Cheatham's right shoe. Cheatham was subsequently arrested and charged for the unlawful possession of a handgun and the possession of prohibited ammunition. He is currently in the custody of the Essex County Department of Corrections.

C. Criminal History

Cheatham has an extensive and violent criminal history, including six prior New Jersey State felony convictions: (1) an August 2017 conviction for resisting arrest and eluding an officer in the second degree; (2) an August 2017 conviction for terroristic threats in the third degree; (3) an October 2018 conviction for terroristic threats in the third degree, for which he was sentenced to five years' probation; (4) an April 2019 conviction for terroristic threats in the third degree, for which he was sentenced 364 days' imprisonment and five years' probation; (5) a February 2020 conviction for shoplifting in the third degree, and (6) a February 2020 conviction for possession of a controlled substance or its analog in the third degree, for which he was sentenced to five years' probation.

Cheatham also has at least six misdemeanor convictions and several probation violations. He was also on probation during both the instant offense and at the time of his February 25, 2021 weapons possession arrest.

III. Argument

Each of the factors enumerated in 18 U.S.C. § 3142(g) weigh heavily against pre-trial release. First, the conduct with which the defendant is charged is serious. As set forth above, the charges relate to the violent home invasion extortion and kidnapping of John Doe, in which the defendant punched and pistol-whipped John Doe so severely that he needed an emergency craniotomy. The defendant committed these acts of violence to extort John Doe of cash and carried out the violent attack in front of Jane Doe and in a home where two small children were present. Thus, the very nature of the charged crimes constitutes clear and convincing evidence in favor of the defendant's detention.

Second, the weight of the evidence of the defendant's guilt is exceedingly strong. The government intends to prove the defendant's guilt at trial through, among other sources, the testimony of multiple witnesses, electronic evidence, and documentary evidence.

For example, records of the defendant's electronic communications with John Doe and location data for the defendant's cell phone align with the events outlined above. In addition, the defendant used a Cash App account in his own name to conduct the drug transaction and used an Uber account and Lyft account, each in his name, to travel to and from the victim's home in Staten Island for the February 2, 2021 drug sale and for the home invasion extortion and kidnapping. In fact, Cheatham created his Lyft account on February 2, 2021 – the day of the home invasion extortion and kidnapping – and used a recent image of himself for the account's profile photo, attached hereto as Exhibit A. This factor therefore strongly weighs in favor of detention.

Third, the defendant's history and characteristics demonstrate that he is a danger to the community and that if he were released, he would also pose a very serious danger to potential witnesses, including the victim. Cheatham has a proven history of violence and has repeatedly violated probation. In addition, Cheatham's own actions during the home invasion are the best evidence of his dangerousness. Not only did he viciously pistol-whip the victim, but he also threatened to kill Jane Doe and her family. It also appears that he continued his criminal behavior when he was arrested with a loaded gun in New Jersey several weeks later and he committed this crime and the home invasion while on probation. Moreover, these offenses are just the latest in his long and violent criminal history. Simply put, Cheatham does not hesitate to resort to violence to further his interests. This indicates that, if he were released, he would be similarly willing to engage in violence in order to secure his freedom or prevent individuals from testifying against him.

Finally, the defendant poses a serious risk of flight due to the lengthy prison term he faces. See, e.g., United States v. English, 629 F.3d 311, 321-22 (2d Cir. 2011) (affirming detention in part because the defendant faced a presumption against release, and a mandatory minimum sentence that incentivized fleeing); United States v. Henderson, 57 F. App'x. 470, 471 (2d Cir. 2003) (summary order) ("the presumption regarding flight risk has changed because [the defendant] now faces a ten-year mandatory minimum sentence"); United States v. Dodge, 846 F. Supp. 181, 184-85 (D. Conn. 1994) (possibility of a "severe sentence" heightens the risk of flight). Even electronic surveillance and home confinement are not sufficient to guard against flight. See United States v. Orena, 986 F.2d 628, 632 (2d Cir. 1993) ("electronic surveillance systems can be circumvented by the wonders of science and of sophisticated electronic technology") (internal quotation marks omitted).

On the firearms charge, the defendant faces a mandatory minimum sentence of seven years' imprisonment and a maximum sentence of life. In addition, the defendant faces a long advisory prison sentence under the United States Sentencing Guidelines. Because of his prior felony terroristic threat convictions, Cheatham is likely a Career Offender, and thus faces an estimated Guidelines range of 444 months to life in prison after trial. Thus, the defendant's significant sentencing exposure gives him a substantial incentive to flee, which also counsels in favor of detention.

IV.    Conclusion

        The defendant poses a significant danger to the community if released pending trial as well as a risk of flight, and no combination of bail conditions will ensure the safety of the community and the defendant's continued appearance before the Court. As a result, the defendant should be detained pending trial.

        Respectfully submitted,

        JACQUELYN M. KASULIS
        Acting United States Attorney
        Eastern District of New York

By:   /s/ Garen S. Marshall
        Garen S. Marshall
        Assistant U.S. Attorney
        (718) 254-6569

cc:    Defense counsel (By Email)

# EXHIBIT A

