# Federal Defenders
## O F   N E W   Y O R K ,   I N C .

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David E. Patton
*Executive Director and*
*Attorney-in-Chief*

Deirdre D. von Dornum
*Attorney-in-Charge*

October 5, 2022

Judge Eric Komitee
United States District Court
225 Cadman Plaza East
Brooklyn, NY 11201

**Re:    United States v. Cheatham No. 21-cr-422-EK**

Dear Judge Komitee,

Ibn Cheatham grew up with an alcoholic mother and an absentee father, who was incarcerated his entire childhood. He was physically abused by his uncles and sexually abused by a cousin. In the 4th grade, he expressed suicidal thoughts and tried cutting his wrists a year later. By the time he was 12, he was smoking marijuana every day; by high school, he was addicted to opiates, using large quantities of Xanax and Percocet every day. He was in special education courses his entire schooling career; he graduated from high school, but still has difficulty with dyslexia and reads only with great effort. Despite these grave challenges, since becoming a young father at 18 years old, he has been an active, loving, and supportive parent. He and his partner Yasmine Hughes been friends since they were 12 years old and are now raising their two young children. He is also a devoted caretaker to his ailing mother.

I am writing in the advance of Mr. Cheatham's sentencing for brandishing a gun in furtherance of an extortion, under 18 U.S.C. § 1951(a) and 924 (c).[1]

---

[1] Attached to this letter are the following exhibits:

Ex. A:      Letters from
         o   Sonya Fortenberry (Mr. Cheatham's mom)
         o   Yasmine Hughes (Mr. Cheatham's partner and mother of his children)

Ex. B:      Forensic-Psychiatric Evaluation, Dr. Alexander S. Bardey

Unsurprisingly, given his addiction history, Mr. Cheatham has been in and out of jail, but – until now – he has never served longer than about a year at once. Now he faces a mandatory minimum of 7 years of incarceration and a guideline range that is much longer. Probation recommends a well below-guideline sentence and I join in that recommendation.

I. **Mr. Cheatham's devotion to his mother and his young children despite his own "extremely difficult childhood"[2] and serious drug addiction.**

John Cheatham, Mr. Cheatham's father, was a heroin addict. PSR ¶ 102. In 1999 he was charged in a federal drug case and was incarcerated for approximately 17 years, between 1999 to 2015. PSR 19; *United States v. John Cheatham*, ECF Dkt. No. 99-cr-752. Ibn Cheatham was only 5 years old when his father went away. When John Cheatham was finally released, he did not even reach out to Mr. Cheatham. PSR ¶ 84.

Mr. Cheatham was raised by his alcoholic mother. PSR ¶ 83. He would see her "drunk all of the time." PSR ¶ 102. When Mr. Cheatham was 11 years old, he was sexually abused by a cousin and was regularly physically abused by his uncles. PSR ¶ 83. As his mother now describes it, her brothers would be "very, very mean" to young Ibn, including an instance when they "jumped him [and] were beating him like a man in the street." Ex. B, p. 10. Today, when asked to describe Mr. Cheatham's upbringing, his mother says that it was "difficult" to raise Mr. Cheatham without his father, but that she "tried [her] best." PSR ¶ 84.

Mr. Cheatham struggled in school. He was assessed to have immature neurological development and speech and language delays when he was 8 years old:

---

Ex. C:         Reentry Plan, by Vivianne Guevara, Director of Social Work & Mitigation, Federal Defenders of New York

Ex. D:         MDC bulletins 2021-2022 noting limited time out of cell, and water and power disruptions

Ex. E:         Letter relating to PSR

[2] Quote from probation sentencing recommendation.

> On the Bender Visual-Motor Gestalt Test, Ibn made 10 errors. The corresponding perceptual-motor age range fell between 5-6 to 5-8. In comparison to other children 8 years and 1 month of age Ibn's performance was below the expected range. Based on the Full Scale IQ of 92, Ibn's performance was significantly below expectancy. The corresponding perceptual-motor standard score was 65. Right hand dominance was indicated on the nine Bender drawings. Pencil grip was poor and pencil pressure was variable. Poor ability to grasp a pencil has been associated with developmental immaturity and various organic neurological conditions in children. Unusually variable

Excerpt Ibn Cheatham's Newark Public School records.

He was placed in special education classes, and diagnosed with dyslexia. PSR ¶ 103. He bounced between schools, and his school records suggest that each school failed to provide needed services, before sending him to a new school:



Example of services needed but not provided from Ibn Cheatham's Newark Public School records.

In a recent conversation with counsel in September 2022, Mr. Cheatham explained that he wished he could read better. He described school as quite "challenging" but he is proud that he graduated.

Mr. Cheatham goes "above & beyond for his family"[3]

Ibn Cheatham started trying to take care of his family – even though they weren't really taking care of him – as a young child. He started working when he was 8 years old, bagging groceries at the local grocery store to help the family with money.

---

[3] Ex. A (Hughes letter).

3

PSR ¶ 84. Despite his mother's alcoholism in his youth, Mr. Cheatham never blamed her, but was, instead, protective of her and "sensitive" if other kids talked badly about her, or mentioned her drinking. PSR ¶ 84.



Today, his mother writes that Mr. Cheatham "always looks out" for her. She is currently suffering kidney failure and is on dialysis. She wrote to the Court about a time her son saved her life after she started bleeding, and then cleaned the blood off the floor so she wouldn't have to see it when she came home. She worries about who will take care of her as she is sick; she knows her son would "be more than willing to if given the opportunity." Ex. A (Fortenberry letter).

Mr. Cheatham and his mother

Mr. Cheatham also has his own young family. He met his partner Yasmine Hughes when they were both around 12 years old and they have been in a long-term relationship since high school. Ms. Hughes writes about him as a partner, helping her through a depression, "helping [her] build [her] confidence" and "become a better mother." Ex. A (Hughes letter). They have two children together, ages 10 and 5. Mr. Cheatham had just started Drake College when his son was born, but he left college as he needed a job to support his family. PSR ¶ 104.



Mr. Cheatham with his young son.

Ms. Hughes describes Mr. Cheatham as a "wonderful father" who was always there for his children, "hospital visits, doctor visits, birthday – he was there." Ex. A (Hughes letter). Before his arrest, he would spend the weekend with his kids. On a

typical Saturday, he would play games with his son and paint his daughter's toenails. He liked to take them to Chuckie Cheese and Mountain Creek Waterpark. He takes great pride in their accomplishments: his son is on the honor roll and his daughter is in kindergarten. When he is released, he wants to spend as much time as he can with his kids.

Now his kids are "feeling the void" of his absence. Ex. A. Recently, Yasmine's mother died. It has been extremely painful for Mr. Cheatham, especially not being able to be there for his children. When he last talked to his son, he just sounded "so sad." Mr. Cheatham asked me: "How many disappointments will [my son] go through in his life and I wouldn't be able to get him any guidance? My son is so sad, he doesn't want to speak on the phone. He wants me to be there in person. It's hard to really talk on the phone in 15 minutes, with all the static." In their letters, both his mother and his partner stress how much Mr. Cheatham's children need him home as soon as possible. *Id.*

Mr. Cheatham's drug addiction and suicidality

Mr. Cheatham started feeling depressed, "sad," "lonely," and "abandoned" when he was around 9 years old. PSR ¶ 93. In the fourth grade, he was admitted into the hospital after saying that he wanted to kill himself. PSR ¶ 93. He also cut himself during childhood. PSR ¶ 93. In fifth and sixth grades he "cut[ ] his wrists," and he attempted suicide in 2018. Ex. B, p. 5. In 2021, he was diagnosed with PTSD, depression and anxiety. PSR ¶ 93.

He started using drugs while still a child. At age 12, he was smoking five marijuana cigarettes a day. By 16, he was taking numerous drugs daily: 10 Xanax pills, 5 Percocet pills, and cough syrup with codeine. PSR ¶ 94. He had taken all of those drugs the day of his arrest. At his arrest, his speech was "slurred" and his "eyes drooped as he struggled to keep them open." PSR 18. Despite this drug history, until now, he has only attended about two months of drug treatment in 2020. Because he was feeling suicidal, he left the program. PSR ¶ 99. During his incarceration, he has been prescribed Naloxone to treat his drug dependance. PSR ¶ 92.

After a psychological evaluation, Dr. Bardey noted that the "combination of traumatic events throughout [Mr. Cheatham's] life precipitated the development of his

trauma-and-stressor-related symptoms and the unhealthy methods with which he has attempted to cope" by abusing drugs. Ex. B, p. 13.

## II.     A below guideline sentence is sufficient.

Probation calculates the guideline range as 130 to 162 months for the extortion count and seven years for the 924(c) count and recommends a below guideline sentence of 144 months for both counts. PSR recommendation.[4] Probation's recommendation recognizes that Mr. Cheatham had an "extremely difficult childhood" and that the current crime and his criminal history "appears to be the result of his own opioid addiction." PSR recommendation.

We join in the request for a substantially below-guideline sentence and urge the Court to find that a sentence lower than that recommended by probation would be substantial, and sufficient but not greater than necessary to achieve the goals of sentencing. *See Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (The "overarching" statutory directive to sentencing courts under § 3553(a) is the "parsimony" clause – the duty to "impose a sentence sufficient, but not greater than necessary" to accomplish the goals of sentencing set forth under § 3553(a)(2)); *United States v. Dorvee*, 616 F.3d 174, 182 (2d Cir. 2010); 18 U.S.C. § 3553(a).

Mr. Cheatham's crime was motivated by his drug addiction; mental health and substance abuse treatment would best serve many of the goals of sentencing.

The sentencing court must "consider every convicted person as an individual and every case as a unique study in human failings" that either mitigate or aggravate the punishment, and then impose the lowest sentence sufficient to satisfy the Section 3553(a)(2) sentencing goals. *Gall v. United States*, 552 U.S. 38, 52-53, 59 (2007) (citation omitted). Here, the crime Mr. Cheatham committed and pleaded guilty to was undeniably serious and a lengthy sentence is mandated. But Mr. Cheatham's unique human failings show that he desperately needs mental health and addiction services.

In  Dr. Bardey's medical opinion, Mr. Cheatham's mental state when he committed the crime was "characterized by acute symptoms of posttraumatic stress

---

[4] We have no objection to the guideline calculation, although note some minor proposed changes to the PSR in a letter to probation attached as Ex. E.

disorder, other specified depressive disorder, and multiple substance use disorders" which "significantly impacted on his thinking, judgment and decision-making during the offense conduct." Ex. B, p. 13. Probation agrees, saying that his crime "appears to be the result of his own opioid addiction." PSR recommendation.

Dr. Bardey also concluded that "given the opportunity to receive intensive substance abuse and trauma-informed therapy, Mr. Cheatham could develop healthy coping mechanisms and insight into the root causes of his behavior, minimizing his risk of recidivism and making successful reintegration into society possible." Ex. B, p. 13.

In other words, with treatment, Mr. Cheatham can succeed. Prison, however, will not provide that treatment.[5] He will not be able to receive that treatment until he is released from incarceration. When he is released, he has a Federal Defenders reentry plan detailing numerous services available to him in New Jersey, where he lives. *See* Ex. C. With the help of the Federal Defenders social work team, Mr. Cheatham will be able to connect to intensive psychological and psychiatric care, long-term case management and justice services, and vocational training specifically for people with mental health diagnoses. Ex. C. The sentencing goals of deterrence, prevention of future crimes, and providing treatment in the most effective manner would all be served by a shorter sentence and getting Mr. Cheatham intensive substance abuse and trauma-informed therapy as soon as possible. *See* 18 U.S.C. § 3553(a).

<u>Mr. Cheatham quickly admitted his conduct and pleaded guilty.</u>

Mr. Cheatham pleaded guilty and accepts full responsibility. Indeed, when first questioned by investigators after his arrest, Mr. Cheatham immediately admitted to selling ███████ drugs, being extremely angry when ███████ payment for the

---

[5] The "vast majority of people in jails and prisons" do not receive the mental health treatment and services they need to "live a crime-free lifestyle." National Institute of Corrections, "Myths & Facts: Why Incarceration is Not the Best Way to Keep Communities Safe," 2016, available at goo.gl/f6M1lu. Indeed, a 2021 government report found that only 15 to 17 % of incarcerated individuals who had a diagnosed mental health problem received professional mental health therapy. U.S. Department of Justice, Bureau of Justice Statistics, Survey of Prison Inmates, 2016, Indicators of Mental Health Problems Reported by Prisoners, June 2021, available at https://bjs.ojp.gov/library/publications/indicators-mental-health-problems-reported-prisoners-survey-prison-inmates.

drugs didn't go through, getting into a physical altercation with ████████ and taking him to a store to retrieve the money. IC_1 (interrogation of Mr. Cheatham). But, Mr. Cheatham also appeared genuinely surprised when investigators told him how badly ████████ had been hurt. ████████ serious injuries do not seem to have been immediately apparent to either person. Mr. Cheatham now takes responsibility for his actions and is genuinely sorry for the harm he caused to ████████.

    Mr. Cheatham fully accepts responsibility for his role in causing ████████ injury. While not minimizing Mr. Cheatham's conduct or the injuries suffered by ████ however, there was a possible contributing cause to the severity of his injuries: On January 30, 2021, ████████ car hit the car in front of him and pushed it approximately 50 feet forward into a third car. This car crash was about 2 ½ days before the altercation with Mr. Cheatham in the early morning of February 2, 2021. ████████ did not go to the hospital until February 9, 2021, and even then, he was seeking drug treatment, apparently still unaware of his head injury. *See* discovery marked IC_3811. The hospital recognized he had a serious brain injury and he went into emergency surgery.

    Even in cases where people are injured with guns, judge in this district and the Southern District of New York often sentence individuals well below 10 years. *See United States v. Rivera*, No. 20-cr-221 (SDNY) (victim shot in neck; sentenced to below guidelines sentence of 100 months); *United States v. Gonzalez*, No. 20-cr-508 (SDNY) (according to government sentence memorandum, defendant fired "multiple shots and multiple people were injured"; sentenced to 72 months); *United States v. Jimenez*, No. 20-cr-122 (SDNY) (victim shot in the leg; defendant sentenced to 105 months ); *United States v. Woodford*, No. 18-cr-654 (EDNY 2021) (imposing below-guideline, 70-month sentence when numerous shots were fired at the victim from close range and victim was severely injured). As in these cases, here, a lengthy, but well-below the guidelines sentence would still reflects the seriousness of the offense, including the severe impact on ████████, respect for the law, and just punishment.

    This Court also can and should take into account the seven-year mandatory minimum sentence on the 924(c) count when determining the appropriate sentence on the underlying extortion count. *See Dean v. United States*, 137 S. Ct. 1170, 1176–77 (2017) (holding that "[n]othing in § 924(c) restricts the authority conferred on sentencing courts by § 3553(a) and the related provisions to consider a sentence imposed under § 924(c) when calculating a just sentence for the predicate count).

Courts in our district often sentence individuals convicted of 924(c) and underlying predicate offenses to vastly below-guideline sentences on the predicate offense, in recognition of the lengthy mandatory sentence. *See e.g., United States v. St. Juste*, 18-cr-554 (DLI) (84 months' custody on count of brandishing a gun, the mandatory minimum, and time served on the Hobbs Act robbery count); *United States v. Reid*, 16-cr-50 (DLI) (60 months on 924 (c));*United States v. Weah*, 17-cr-334 (NGG) (84 months' custody on count of brandishing a gun, the mandatory minimum, and 3 months on underlying robbery and conspiracy); *United States v. Ortiz*, 17-cr-452 (NGG) (60 months on count of possessing a gun, the mandatory minimum, and one day on robbery); *United States v. London*, 15-cr-522 (CBA) (60 months on 924(c) and one month on underlying drug crime); *United States v. Person*, 15-cr-466 (ILG) (60 months on 924(c) and one day on underlying drug count); *United States v. Francois*, 16-cr-281 (PKC) (60 months on 924(c) and 3 months on robbery); *United States v. Glisson*, 16-cr-281 (PKC) (60 months on 924(c) and 1 day on robbery).

<u>The Court should also take into account the overly harsh conditions at MDC</u>

Mr. Cheatham has been incarcerated at MDC for the past approximately 14 months. Even though the worst of COVID has apparently passed for those who are in the community, the MDC lockdowns have continued, because of outbreaks of the virus, because the jail is short-staffed, or just because that's what the jail got used to. During his time at MDC, Mr. Cheatham estimates he was locked down at least five months. Even when not formally locked down, there were still many days that he wasn't let out of his cell, or was let out for only 30 minutes – not enough time to shower, launder his clothes, and make a phone call home, especially when every other incarcerated person is trying to do the same things. Even during the better times, he was let out only about 3 hours a day. *See* MDC bulletins, Ex. D. The general conditions at MDC are also abhorrent in other ways: The food is cold and often rotten. The water is often brown, or shut-off. Mr. Cheatham spends his days hungry, and with no access to the outdoors.

Many courts have concluded that the "onerous lockdowns and restrictions imposed by the correctional facilities attempting to control the spread of the virus have made sentences 'harsher and more punitive than would otherwise have been the case.'" *U.S. v. Hatcher*, 2021 WL 1535310 (S.D.N.Y. April 19, 2021), quoting *U.S. v. Rodriguez*, 492 F.Supp.3d 306, 311 (S.D.N.Y. 2020); *see also U.S. v. Mcrae*, No. 17 Cr. 643, 2021 WL 142277 at *5 (S.D.N.Y. Jan. 15, 2021); *U.S. v. Ciprian*, No. 11 Cr. 1032-

74 (PAE), 2021 U.S. Dist. LEXIS 18698, at *8 (S.D.N.Y. Feb. 1, 2021). Accordingly, sentencing judges have granted leniency for those incarcerated during this time of disease and lockdowns, acknowledging that the unusual harshness of incarceration during these times diminishes the retributive or deterrent need for a longer sentence. This Court should take the harsh conditions into account when sentencing Mr. Cheatham.

<u>The Court should take into account time Mr. Cheatham spent at MDC that will not be automatically counted in his sentence.</u>

The Court should also take into account that some of Mr. Cheatham's time at MDC will not be automatically counted towards his federal sentence. Because Mr. Cheatham was arrested by the State of New Jersey, and was in federal custody on a writ, he did not get federal jail credit from February 2021 until April 2022. For 11 of those months, from June 2021 to April 2022, Mr. Cheatham was at MDC. (In April, New Jersey withdrew the state detainer, so his federal time started counting). This Court should, therefore, credit Mr. Cheatham the 11 months he spent at MDC, by reducing his sentence by that amount.

\*       \*       \*

Mr. Cheatham is a loving father and son, whose family desperately needs him. His children especially need their father before they turn into adults. They and Mr. Cheatham respectfully ask the Court to sentence him with compassion and generosity of spirit:

> "Sentencing, that is to say punishment, is perhaps the most difficult task of a trial court judge. While there are many competing considerations in every sentencing decision, a sentencing judge must have some understanding of the diverse frailties of humankind…a sentencing judge must have a generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain."

> *United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017) (citations omitted).

Here, in weighing Mr. Cheatham's human failings and the harm he has caused with the treatment he requires and the family who needs him, we respectfully ask the Court to sentence Mr. Cheatham well-below the guidelines.

Sincerely,

_____/s/_____
Allegra Glashausser
Staff Attorney
(212) 417-8739

11

# Exhibit A

September 26, 2022

Dear Judge Komitee,

I am writing this letter concerning my son Ibn Cheatham. I have not seen my son in almost two years because of his incarceration during COVID and it hurts my heart every day. He also has two beautiful children who love and miss him every single day. I write this with tears in my eyes and heart because I do know he will be away from us for some time, but if there is any way, please see and understand that his children miss him and need him home as soon as possible.

Ibn was raised without his father. His father was incarcerated. I think Ibn has been holding in all this pain his whole life about not having a dad. I believe that not having a father really affected Ibn. I can only imagine how conflicted Ibn was growing up, maybe thinking it was his fault. I was a single parent raising 3 children. Ibn is my youngest son, my baby boy. My oldest son played semi pro basketball ball in Iceland, now owns his own fitness gym in Chattanooga Tennessee, my daughter Jazmine is a chef. But Ibn struggled. He suffers from anxiety, emotional issues, and learning problems. Ibn did graduate from high school and when Ibn is working, he is focused. One of his old supervisors at the City of Newark told me he was an excellent employee and that he was passionate about his work.

Ibn has a sweet disposition. He loves kids. He would check on his cousins, play with his girlfriend's nephews. He understood kids, especially those without fathers. He also always looks out for me and does all he can to take care of me. As an adult, he would call me every day to check on me and see if I needed anything. Two years ago, Ibn helped save my life. I am a dialysis patient. I was on the phone with Ibn when I started bleeding to death in my home alone – I almost died. Ibn flagged down a police officer to get help to me, and then found the superintendent of my building so police could get in and rescue me. I had to stay in the hospital for two weeks. When I got out of the hospital, my apartment was sparkling. Ibn came to help clean up my blood from my apartment before I came home. I worry about who's going to be able to take care of me. Ibn would be more than willing to if given the opportunity

I'm praying that the cycle of incarceration is not repeated. Ibn's father was in jail and now Ibn is in jail. I'm seeing the same emotions in my grandson that I would see in Ibn when he was young. I'm praying that Ibn can get home sooner than his father did so that he can be there for his son ▮▮▮▮ and his daughter ▮▮▮▮. They both need their daddy.

My son has flaws but I think with the right help, he will and can do better. He would be better. I'm positive that given the right opportunities and the right mental health help, Ibn can positively contribute to society. My son Ibn is a very respectful person. I wish he could have found help, a program, out here before he got so lost.

I'm so scared that I'm not going to have the opportunity to see my son ever again. My time here on this earth is limited due to my health problems. I'm already 56 years old. My preexisting conditions have made it impossible to visit him at MDC. I haven't seen my son one time since he's been at the MDC. It's hard for me to think I may not ever see Ibn because of distance, never hug him, never see his beautiful smile. I am begging the courts and the judge to please take the things my words into consideration for my son's sentencing. I hope and pray this letter helps my son Ibn. I hope you can understand how much I and his children need him. I love and miss him daily

Truly I thank you for taking time and reading my letter.

Affectionately,

Sonya R Fortenberry

Dear Judge Komitee,

I'm writing this letter on behalf of Ibn Cheatham. Ibn is a wonderful father and never missed a moment in his kids life's from hospital visits, doctor visits, birthdays – he was there. Judge, I ask that you spare Ibn's life on the sake of his kids.

Now my kids are feeling the void of him not being there. Especially our 10 year old son. He needs him the most. It's hard out here for black men as it is. He's the only man in my son life and that's his father! Young boys need a father. It's things I would never be able to teach him or show him because I'm not a man. He ask me every day when his father is coming back & it hurts because I don't have the answers for him. Ibn will go above & beyond for his family, he's our protector and I love the man he became.

Ibn really has a good heart. He is a family man, a worker, a provider. Ibn is always making sure others are good and never once thinks about his self. I've seen him give strangers his last – he has such a big heart & his faith is out of this world. Even at the worst times of his life, he always find the light of any situation. That's what I love and miss about him.

He's my best friend. He helped me through depression. He was there for me at the worst time of my life when I hated myself.  He helped me build my confidence, he helped me become a better mother. He taught me patience because boy he has a lot of it. I've learned so much from him and I'll forever cherish those moments.

Everyone makes mistakes, that's a part of growing. Instead of locking him up, please give the brother some help. My kids need him. His mom needs him. His mom is on dialysis, he needs to be there with her. Judge I ask that you please give him another chance.


Sincerely,

Yasmin Hughes

# Exhibit B

# Exhibit C

**Re-Entry Plan** | **Mr. Ibn Cheatham**
**October 2022**

The goal of Mr. Ibn Cheatham's re-entry plan is to provide resources that support Mr. Cheatham's need for intensive healing from trauma. Federal Defenders staff will work with Mr. Cheatham to connect him to organizations and resources that support his wellness needs, as well as his employment and vocational goals.

## RESOURCES

### POST-RELEASE MENTAL HEALTH SUPPORT

**Rutgers University Behavioral Health**
Adult Acute Partial Hospitalization
183 South Orange Ave.
Newark, NJ 07103
800-969-5300
https://ubhc.rutgers.edu/clinical/partial-hospitalization/adult-acute-partial-hospital-program.xml

Intensive psychological and psychiatric care via day group-based program that provides treatment, support, and case management services for those who suffer from a mental illness which may also include substance abuse.
Services
- Psychiatric evaluation
- Psychoeducation
- Group and individual therapy
- Medication management and education
- Life skill development
- Addiction and recovery services
- Prevocational services
- Wellness counseling
- Case management
- Family supports and education
- Specialized services include cognitive behavioral therapy, dialectical behavior therapy, trauma treatment, art therapy, music therapy, and horticulture therapy
- Coordination of care with medical providers
- Referrals and linkages to housing and employment services
- Transportation

**Integrated Case Management Services**
Mental Health Association - Essex County
80 Main Street, Suite 500
West Orange, NJ 07052

- Assertive outreach program
- Assessment, advocacy, empowerment, referral, linkage, and supportive counseling
- Designed to assist adults in their recovery based on individual needs and interests and helping them gain access to medical, social, educational, housing and other services and resources available to them.
- ICMS services are provided predominantly off-site in the consumer's natural environment ("in-vivo") and have no out of pocket cost to the individual.

### LONG-TERM CASE MANAGEMENT AND SUPPORT

**Collaborative Justice Services Expansion Program**
Mental Health Association – Essex County
80 Main Street, Suite 500
West Orange, NJ 07052

- Promotes recovery through engagement, assessment of readiness for change.
- Linkage of individuals to mental health treatment, financial, housing, and other needed services.
- Team of clinicians and case managers provides advocacy and supportive counseling.
- Means of referral include mental health professionals, community advocates, defense attorneys, law enforcement, court personnel or family members.
- Helps divert defendants from having or adding to a criminal history and/or serving a custodial sentence.

### VOCATIONAL TRAINING AND EDUCATION

**Supported Employment Services**
Mental Health Association – Essex County
80 Main Street, Suite 500
West Orange, NJ 07052

- Assist individuals who have a history of mental illness obtain and retain employment in a competitive setting in the community.
- Mission is to successfully place individuals with a severe and persistent mental illness in gainful employment.
- Present through every step of the employment process, providing job exploration sessions, skills needed for the desired position, on-site job coaching, and support after successful employment.

**NJ Reentry Corporation**
936-938 Bergen Street
Newark, New Jersey 07112
Phone: 973.982.6896
https://www.njreentry.org/locations/newark

Connects individuals with the Governor's Reentry Training and Employment Center, which offers training in:
- Solar Technology
- Construction
- CISCO Networking Technician
- Automobile Mechanics
- SEIU/Healthcare Maintenance
- GED/High School Diploma
- Plumbing Assistant and Building Maintenance
- Mechanics
- Certified Phlebotomy Technician
- Telemedicine and Addiction Treatment

# Exhibit D

# REC SCHEDULE

| TIME | SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|---|
| 5:40-6:10pm | BT 13-15 | TT 20-22 | BT 10-12 | TT 10-12 | BT 10-12 | BT 20-22 | TT 13-15 |
| 6:20-6:50pm | BT 16-19 | TT 23-25 | BT 7-9 | TT 7-9 | BT 7-9 | BT 23-25 | TT 16-19 |
| 7:00-7:30pm | BT 20-22 | TT 26-28 | BT 4-6 | TT 4-6 | BT 4-6 | BT 26-28 | TT 20-22 |
| 7:40-8:10pm | BT 23-25 | TT 29-31 | BT 1-3 | TT 1-3 | BT 1-3 | BT 29-32 | TT 23-25 |
| 8:20-8:50pm | BT 26-28 | DEEP CLEANING | DEEP CLEANING | DEEP CLEANING | DEEP CLEANING | DEEP CLEANING | TT 26-28 |
| 9:00-9:30pm | BT 29-32 | DEEP CLEANING | DEEP CLEANING | DEEP CLEANING | DEEP CLEANING | DEEP CLEANING | TT 29-31 |

REGULAR UNITS

1/2 Hours (30 MINUTES) out of cell time - This applies to G-43, H-51, H-52, H-53 I-61, I-62, I-63, J-71, J-72 and J-73.

Out of cell time of 3 cells (no more than 6 inmates) at a time for 1/2 hours (30 MINUTES). Inmates can use phones, computers, showers, and recreation areas.

Please allow for 2 unit orderlies to clean phones, computers, and showers between groups.

If you have any questions, please contact the Lieutenant's Office, 5950 or 5951.

# REC SCHEDULE

SUNDAY THRU SATURDAY

TT = TOP TIER     BT= BOTTOM TIER

| TIME | SUNDAY | MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY |
|---|---|---|---|---|---|---|---|
| 6:00–6:30am | TT 1-3 | BT 1-3 | TT 29-31 | BT 29-32 | TT 29-31 | TT 1-3 | BT 1-3 |
| 6:40-7:10am | TT 4-6 | BT 4-6 | TT 26-28 | BT 26-28 | TT 26-28 | TT 4-6 | BT 4-6 |
| 7:20-7:50am | TT 7-9 | BT 7-9 | TT 23-25 | BT 23-25 | TT 23-25 | TT 7-9 | BT 7-9 |
| 8:00-8:30am | TT 10-12 | BT 10-12 | TT 20-22 | BT 20-22 | TT 20-22 | TT 10-12 | BT 10-12 |
| 8:40-9:10am | TT 13-15 | BT 13-15 | TT 16-19 | BT 16-19 | TT 16-19 | TT 13-15 | BT 13-15 |
| 9:20-9:50am | TT 16-19 | BT 16-19 | TT 13-15 | BT 13-15 | TT 13-15 | TT 16-19 | BT 16-19 |
| 10:00-10:30am | COUNT TIME | BT 20-22 | TT 10-12 | BT 10-12 | TT 10-12 | TT 20-22 | COUNT TIME |
| 10:40-10:00Am | COUNT TIME | BT 23-25 | TT 7-9 | BT 7-9 | TT 7-9 | TT 23-25 | COUNT TIME |
| 11:00-11:30am | TT 20-22 | BT 26-28 | TT 4-6 | BT 4-6 | TT 4-6 | TT 26-28 | BT 20-22 |
| 11:40-12:10pm | TT 23-25 | BT 29-32 | TT 1-3 | BT 1-3 | TT 1-3 | TT 29-31 | BT 23-25 |
| 12:20-12:50pm | TT 26-28 | TT 1-3 | BT 29-32 | TT 29-31 | BT 29-32 | BT 1-3 | BT 26-28 |
| 1:00-1:30pm | TT 29-31 | TT 4-6 | BT 26-28 | TT 26-28 | BT 26-28 | BT 4-6 | BT 29-32 |
| 1:40-2:10pm | BT 1-3 | TT 7-9 | BT 23-25 | TT 23-25 | BT 23-25 | BT 7-9 | TT 1-3 |
| 2:20-2:50pm | BT 4-6 | TT 10-12 | BT 20-22 | TT 20-22 | BT 20-22 | BT 10-12 | TT 4-6 |
| 3:00-3:30pm | BT 7-9 | TT 13-15 | BT 16-19 | TT 16-19 | BT 16-19 | BT 13-15 | TT 7-9 |
| 5:00-5:30pm | BT 10-12 | TT 16-19 | BT 13-15 | TT 13-15 | BT 13-15 | BT 16-19 | TT 10-12 |

# WATER SHUT OFF

On Tuesday March 09, 2021 at 9:00 PM the water will be shut off for repair work. Inmates will be given a bottle of water before they lock down for the night. The water will be back on around 2:00 AM.

On Thursday, March 11, 2021, at 9:00 p.m., the water will only be turned off for eight (8) hours so the City may be able to do some upgrading to the infrastructure in the community. Inmates will be given two (2) bottle of water before they are secured for the night. It is projected the water will be back on around 5:00 a.m., Friday, March 12, 2021.



U.S. Department of Justice

Federal Bureau of Prisons

Metropolitan Detention Center – Brooklyn
80 29th Street
Brooklyn, New York 11232

May 13, 2021

MEMORANDUM FOR STAFF AND THE INMATE POPULATION

FROM:           J.J. White, Captain

SUBJECT:        Out of cell schedule – Effective May 31, 2021

### UNIT QUADRANT BREAKDOWN

| Top Tier Cells 1-15 | Top Tier Cells 16-31 |
|---|---|
| 1 | 2 |
| **Bottom Tier Cells 1-15** | **Bottom Tier Cells 16-32** |
| 3 | 4 |

| DATE | 6:30 – 9:30 a.m. | 9:30 – 12:30 p.m. | 12:30 – 3:30 p.m. | 5:00 – 8:00 p.m. |
|---|---|---|---|---|
| Mon 5-31-21 | 3 | 4 | 1 | 2 |
| Tue 6-01-21 | 4 | 1 | 2 | 3 |
| Wed 6-02-21 | 1 | 2 | 3 | 4 |
| Thu 6-03-21 | 2 | 3 | 4 | 1 |
| Fri 6-04-21 | 3 | 4 | 1 | 2 |
| Sat 6-05-21 | 4 | 1 | 2 | 3 |
| Sun 6-06-21 | 1 | 2 | 3 | 4 |
| Mon 6-07-21 | 2 | 3 | 4 | 1 |
| Tue 6-08-21 | 3 | 4 | 1 | 2 |
| Wed 6-09-21 | 4 | 1 | 2 | 3 |
| Thu 6-10-21 | 1 | 2 | 3 | 4 |
| Fri 6-11-21 | 2 | 3 | 4 | 1 |

# Tier Time / Out of Cell Time

| Tier Times | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|---|
| 6:00 a.m. – 10:00 a.m. | All Cells Top Tier | All Cells Bottom Tier | All Cells Top Tier | All Cells Bottom Tier | All Cells Top Tier | All Cells Bottom Tier | All Cells Top Tier |
| 11:00 a.m. – 3:00 p.m. | All Cells Bottom Tier | All Cells Top Tier | All Cells Bottom Tier | All Cells Top Tier | All Cells Bottom Tier | All Cells Top Tier | All Cells Bottom Tier |

## 1st and 3rd Week of every Month

| Tier Times | Sunday | Monday | Tuesday | Wednesday | Thursday | Friday | Saturday |
|---|---|---|---|---|---|---|---|
| 6:00 a.m. – 10:00 a.m. | All Cells Bottom Tier | All Cells Top Tier | All Cells Bottom Tier | All Cells Top Tier | All Cells Bottom Tier | All Cells Top Tier | All Cells Bottom Tier |
| 11:00 a.m. – 3:00 p.m. | All Cells Top Tier | All Cells Bottom Tier | All Cells Top Tier | All Cells Bottom Tier | All Cells Top Tier | All Cells Bottom Tier | All Cells Top Tier |

## 2nd and 4th Week of every month

Should a month have a 5th week in it, you will follow the 1st and 3rd week schedule for tier time.

Captain J. J. White : _____



# MDC BROOKLYN

# INMATE BULLETIN

Effective From October 8th through October 11th, 2021, MDC Brooklyn will be conducting preventive maintenance which will intermittently affect power to the west building.  As a result of the preventive maintenance, social and legal visiting hours for these dates will be adjusted from their normal time to the following hours which will be 8:00 am to 3:30 pm.

During the days indicated above your meals will run normally with the exception of the evening meals which will be served as a box meal.

A partir del 8 de octubre hasta el 11 de octubre de 2021, MDC Brooklyn llevará a cabo un mantenimiento preventivo que afectará intermitentemente la energía del edificio oeste. Como resultado del mantenimiento preventivo, el horario de visita social y legal para estas fechas se ajustará de su horario habitual al siguiente horario que será de 8:00 am a 3:30 pm.

Durante los días indicados anteriormente, sus comidas se ejecutarán normalmente, con la excepción de las cenas que serán un almuerzo en caja.

# MDC BROOKLYN

## INMATE BULLETIN

## Domestic Water Interruption

On Friday, April 22, 2022, at approximately 9:30 p.m. the
Facilities Department will be conducting preventative
maintenance/repairs to the domestic water supply. A scheduled
shut down the domestic water (hot and cold) will be necessary to
perform this repair. The outage is scheduled to start April 22,
2022, at 9:30 p.m. and will be restored by 5:30 a.m. an April
23, 2022, not to exceed 7 hours. Bottled water will be
delivered in addition to the evening meal to be consumed during
this outage. Potable water will also be delivered in bulk to
each for to be disseminated to cells as needed to flush toilets.

El jueves 22 de abril de 2022, aproximadamente a las 9:30 p.m.,
el Departamento de Instalaciones realizará mantenimientos /
reparaciones preventivas al suministro de agua doméstica. Será
necesario un apagado programado del agua sanitaria (caliente y
fría) para realizar esta reparación. La interrupción está
programada para comenzar el 22 de marzo de 2022 a las 9:30 p.m.
y se restablecerá a las 5:30 a.m. al 23 de abril de 2022, sin
exceder las 7 horas. Se entregará agua embotellada además de la
cena que se consumirá durante este apagón. El agua potable
también se entregará a granel a cada uno para que se disemine a
las celdas según sea necesario para descargar los inodoros.

_____//s//_____                           April 21, 2022

Brooklyn Executive Staff                         Date

Notice to the Inmate Population

Modified Lockdown - Effective May 17, 2022

MDC Brooklyn will operate under modified operations. Inmates residing in the West Side Housing Units will be permitted 3 hours in the common area of the unit Monday - Friday and 2 hours of out of cell time during the weekends. During the out of cell time, inmates may utilize the recreation deck, computers, telephones and take showers. Out of cell time will commence at 6 am and will conclude at 8 pm.

The quarantine, special housing, restrictive housing and SAMS units will operate as normal.

Unit cleanliness, cell sanitation, use of PPE and all other safety measures will remain in place and strictly enforced.



# MDC BROOKLYN

# INMATE BULLETIN

MDC Brooklyn will be conducting preventive maintenance which will intermittently affect power to the West building on July 09th and July 10th, 2022, from 10:00 a.m. to 10:00 p.m. each day.

During the days indicated above your meals and visiting will run as normal.

MDC Brooklyn llevará a cabo un mantenimiento preventivo que intermittently afectar el poder al Nosotrosedificio st desde las 10:00 a.m., el 9 de julio de 2022, hasta las 10:00 p.m., y nuevamente el 10 de julio de 2022, hasta las 10:00 p.m.

Durante los días indicados anteriormente sus comidas y visitas se ejecutarán con normalidad.

# Exhibit E

# Federal Defenders
## O F   N E W   Y O R K ,   I N C.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David E. Patton
*Executive Director and*
*Attorney-in-Chief*

Deirdre D. von Dornum
*Attorney-in-Charge*

Oct. 5, 2022

Officer Jameka Bing
United States Probation Officer
Brooklyn, NY 11201

Re:   **United States v. Cheatham No. 21-cr-422-EK**

Dear Officer Bing,

I am writing to respectfully submit the below suggested corrections to Ibn Cheatham's presentence report.

We have a few small factual corrections:

- ¶82: Calvin is about 40 years old (not 30 years old);

- ¶89: Mr. Cheatham's seizures subsided when he <u>stopped</u> using drugs. Using drugs exacerbated his seizures;

- ¶104: The college Mr. Cheatham began attending was "Drake College" in New Jersey.

While we have no disagreement with the guidelines calculation, we respectfully note that three of Mr. Cheatham's prior convictions that were assessed as counting for one criminal history point should not receive criminal history points. This requested change does not alter the ultimate criminal history category.

- ¶ 45: This case received a diversionary disposition, and Mr. Cheatham's RAP sheet indicates that these charges were dismissed. IC_33. Based on available information, this arrest should not receive criminal history points. *See* U.S.S.G. § 4A1.2(f) (diversion from the judicial process without a finding of guilt…is not counted).

1

- ¶ 53: As noted in the PSR, this case "no longer appears on [Mr. Cheatham's] criminal history printout." As this case appears to have been dismissed, it should not be counted.

- ¶ 50: Mr. Cheatham's conviction for possession of marijuana should not receive any criminal history points. *See* N.J.S.A. 2C:35-10(a)(4). This is no longer a crime in New Jersey and was subject to automatic expungement. *See* Expungement of Certain Marijuana or Hashish Cases, https://www.njcourts.gov/marihashexpunge.html.

Additionally, we respectfully request that arrests that resulted in dismissals, ¶ 61-78, be removed from the report. These cases are not criminal history. *See United States v. Kahmel Mobley*, 21 Cr. 377 (RPK) (E.D.N.Y.), March 10, 2022 Minute Entry and Order (striking arrest information from PSR because it is sealed under NY law and does not constitute "criminal history"). Additionally, these paragraphs are unreliable as they are based on information in a database that could not be confirmed by the courts. *See* ¶ 61-66, 68-69, 72-74, 77-78 (each noting that "court documents were not received").

Accordingly, I respectfully request that the presentence report be amended.

Sincerely,

_____/s/_____
Allegra Glashausser
Staff Attorney
(212) 417-8739

2