

U.S. Department of Justice

United States Attorney
Eastern District of New York

JMS:GSM
F. #2021R00235

271 Cadman Plaza East
Brooklyn, New York 11201

January 8, 2023

<u>By ECF and E-Mail</u>

The Honorable Eric R. Komitee
United States District Judge
Eastern District of New York
271 Cadman Plaza East
Brooklyn, New York 11201

   Re: United States v. Ibn Cheatham
      <u>Criminal Docket No. 21-422 (EK)</u>

Dear Judge Komitee:

  On April 13, 2022, the defendant Ibn Cheatham pled guilty before the Honorable Vera M. Scanlon, United States Magistrate Judge, to committing physical violence in furtherance of an extortion, in violation of Title 18, United States Code, Section 1951(a) ("Count Two"). <u>See</u> Revised Presentence Investigation Report (Dec. 19, 2022) ("PSR") ¶ 1. On August 17, 2022, this Court issued an Order accepting the defendant's plea of guilty to Count Two.[1]

  But for the measures taken by medical professionals to save the victim's life, the crime in this case would have been murder, rather than extortion. Accordingly, and for the reasons set forth below, the government respectfully requests that the Court impose a sentence within the applicable United States Sentencing Guidelines ("U.S.S.G." or "Guidelines") range of 210 to 240 months' custody. <u>See</u> PSR ¶ 117.

---

 [1] On April 13, 2022, the defendant also pled guilty to brandishing a firearm during a crime of violence, in violation of Title 18, United States Code, Section 924(c)(1)(A)(ii) ("Count Three"). However, on November 2, 2022, the government moved to dismiss Count Three, <u>see</u> ECF No. 41, in accordance with recent guidance from the Department of Justice. On November 15, 2022, the Court granted the government's motion and dismissed Count Three. Accordingly, the government submits this revised sentencing memorandum for the Court's consideration.

I.      Background

On January 29, 2021, the defendant sold narcotics to the victim of the instant offense (the "Victim") in person in Newark, New Jersey. PSR ¶ 6. During the sale, the defendant provided his cell phone number to the Victim to call for future drug purchases. Id.

After arranging a second sale by phone, around January 31, 2021, the defendant drove, with his girlfriend, from New Jersey to the Victim's home in Staten Island, New York, where the defendant sold the Victim narcotics. Id. ¶ 7.

Finally, after coordinating a third sale by phone around February 1, 2021, the defendant used his Uber account to arrange a ride from New Jersey to the Victim's home in Staten Island. Id. ¶ 8. The defendant arrived at the Victim's home at approximately 1:47 a.m.[2] on February 2, 2021 and sold the Victim heroin and Xanax. Id. The Victim attempted to pay the defendant $250 (payment for the drugs and the defendant's transportation) via a Cash App payment to the defendant's account. Id. At that time, the Victim believed that the Cash App payment to the defendant had gone through. Id. However, it was later revealed that the payment had been automatically blocked. Id.

Following the February 2 drug sale and the attempted Cash App payment, the defendant used his Lyft account to arrange a ride from the Victim's home back to Newark, New Jersey. Id. ¶ 9. The defendant was picked up at approximately 2:45 a.m. and dropped off in New Jersey at approximately 3:22 a.m. Id.

From approximately 3:36 a.m. to 4:17 a.m., the defendant placed more than a dozen outgoing calls to the Victim. Id. ¶ 10. However, the Victim had ingested the Xanax the defendant sold him and was asleep. Id.

Then, the defendant used his Lyft account to order another ride from New Jersey to the Victim's home in Staten Island, New York. Id. ¶ 11. The Lyft driver picked the defendant up in Newark, New Jersey at approximately 4:35 a.m. and, as corroborated by cellular telephone location data for the defendant's cell phone, arrived back at the Victim's home at approximately 5:00 a.m. on February 2, 2021.

The defendant initially pounded on the front door to the Victim's home, yelling, in sum and substance, "Police! Open the door!" See id. ¶ 12. This awoke the Victim's girlfriend ("Jane Doe"), who then awoke the Victim. Id. However, before the Victim and Jane Doe could react, the defendant broke through both the vestibule door and the front door to their home. Id. Once in the home, the defendant began punching and pistol-whipping the Victim on the nose and on the top of the Victim's head with the handle of a small handgun. Id. As he beat the Victim, the defendant indicated that he had repeatedly attempted to contact the Victim because the Cash App payment the Victim had sent did not go through. Id.

---

[2] All times cited are in Eastern Standard Time.

2

Once the defendant finished beating the Victim with both the gun and the defendant's fists, the defendant racked the slide of the gun and told the Victim to wipe his face clean and to go with the defendant to an ATM to retrieve money to pay the defendant. Id. ¶ 13.  The defendant also told Jane Doe, in sum and substance, not to call anyone and that if she called the police he would come back and kill her and her family.  Id.  The defendant and the Victim then got into the Lyft vehicle, which was still waiting outside, and drove to a nearby convenience store, where the Victim withdrew approximately $400 from an ATM and gave the defendant $380.  Id.  The defendant then left in the Lyft vehicle and was dropped back off in Newark, New Jersey at approximately 5:54 a.m.  Id.

Several days later, the Victim attempted to voluntarily commit himself to a detoxification program in Staten Island.  Id. ¶ 14.  However, as he was checking in, the receptionist noticed "white goo" leaking from the Victim's nose and called an ambulance. Id.  The Victim subsequently lost consciousness and underwent emergency surgery.  Id. Medical records reveal that the Victim's nose was broken and that he had suffered a subdural hematoma, also known as a "brain bleed."  Id.  To save the Victim's life, doctors performed an emergency craniotomy, cutting open the Victim's skull to remove the hematoma.  Id. Following the craniotomy, the Victim was put into a medically induced coma and had approximately 70 surgical staples applied to his head.  Id.

Thus, not only did the defendant extort and kidnap the Victim over a small drug debt, but he also beat and pistol-whipped the Victim, causing life-threatening injuries. In addition, the defendant carried out the home invasion and attack while the Victim and Jane Doe's children were present in the home.  Id. ¶ 15.

On August 12, 2021, a grand jury in the Eastern District of New York returned a three-count indictment charging the defendant with kidnapping, committing physical violence in furtherance of an extortion, and possessing and brandishing a firearm during a crime of violence, in violation of Title 18, United States Code, Sections 1201(a)(1), 1951(a), 924(c)(1)(A)(i), and 924(c)(1)(A)(ii), respectively.

II.     Applicable Law

In Gall v. United States, 552 U.S. 38 (2007), the Supreme Court set forth the procedure that sentencing courts must follow in light of United States v. Booker, 543 U.S. 220, 258-60 (2005):

> [A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range.  As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark.

Gall, 552 U.S. at 49 (citation omitted).  Next, a district court must "consider all of the § 3553(a) factors to determine whether they support the sentence requested by a party.  In so doing, [a district court] may not presume that the Guidelines range is reasonable.  [A district

3

court] must make an individualized assessment based on the facts presented." Id. at 49-50 (citation and footnote omitted).

Section 3553(a) directs the sentencing court to consider the following factors, among others, when imposing a particular sentence: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; and (2) the need for the sentence imposed: (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (B) to afford adequate deterrence to criminal conduct; and (C) to protect the public from further crimes of the defendant.

At sentencing, "the court is virtually unfettered with respect to the information it may consider." United States v. Alexander, 860 F.2d 508, 513 (2d Cir. 1988). Indeed, Title 18, United States Code, Section 3661 expressly provides that "[n]o limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence." Thus, the Court must first calculate the correct Guidelines range, and then apply the Section 3553(a) factors to arrive at an appropriate sentence, considering all relevant facts.

III.  Sentencing Guidelines

The government submits that the following Guidelines calculation, which is consistent with the calculation set forth in the PSR (as set forth in the Second Addendum to the PSR, dated December 29, 2022), should be adopted by the Court:

Count Two: Committing Physical Violence in Furtherance of an Extortion

| | | |
|---|---|---:|
| | Base Offense Level (§ 2B3.2) | 18 |
| Plus: | The offense involved an express or implied threat of death, bodily injury, or kidnapping (§ 2B3.2(b)(1)) | +2 |
| Plus: | A firearm was used (§ 2B3.2(b)(3)(A)(ii)) | +6 |
| Plus: | The offense involved preparation to carry out a threat of death, serious bodily injury, or kidnapping (§ 2B3.2(b)(3)(A)(ii)) | +3 |
| Plus: | Victim suffered a life-threatening bodily injury (§ 2B3.2(b)(4)(C)) | +6 |
| Less: | The cumulative adjustments from §§ 2B3.2(b)(3) and 2B3.2(b)(4) shall not exceed 11 levels | -4 |
| Plus: | Victim was abducted to facilitate commission of the offense (§ 2B3.2(b)(5)(A)) | +4 |

4

|   |   |   |
|---|---|---|
| Less: | Acceptance of Responsibility (§ 3E1.1) | -3 |
|   | Total: | 32 |

PSR ¶¶ 22-30, 37-39.  Based upon a total offense level of 33 and Criminal History Category VI, the applicable Guidelines range for the defendant is 210 to 240 months' imprisonment. Id. ¶ 117.[3]

IV.     Section 3553(a) Factors Weigh in Favor of the Requested Sentence

       For the reasons set forth below, the government respectfully requests that the Court impose a sentence within the applicable Guidelines range of 210 to 240 months' imprisonment.  Such a sentence is appropriate given the nature and circumstances of the offense, the history and characteristics of the defendant, and the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment, to afford adequate deterrence and to protect the public.

    A.     Nature and Circumstances of the Offense

       As set forth above, the nature and circumstances of the offense are abhorrent. The defendant, having not received the Victim's $250 payment, placed more than a dozen outgoing calls to the Victim over a 41-minute period.  After failing to get in touch with the Victim, the defendant took a 25-minute Lyft ride from Newark, New Jersey, to the Victim's home in Staten Island.  The defendant arrived at the Victim's home at 5:00 a.m., and, after yelling that it was the police, proceeded to break into the home—kicking in both the outer vestibule door, and then the inner door—making his way into the small residence where the Victim, his girlfriend, and two small children were present.

       Once inside, the defendant beat the Victim, who is substantially smaller than the defendant.  In fact, the defendant beat the Victim with his fists and repeatedly pistol-whipped the Victim with the handle of a gun.  The beating was so vicious and severe that it left the Victim with a broken nose and a subdermal hematoma, requiring a craniotomy and nearly costing the Victim his life.

       Finally, once the defendant was satisfied with the physical damage he had inflicted on the Victim, the defendant racked his gun, and directed the Victim to get in the

---

[3] In the plea agreement, which was executed on April 13, 2022, the government calculated the defendant's Guidelines, after a three-point reduction for acceptance of responsibility, as 262 to 327 months' custody.  This calculation considered the defendant to be a career offender under the Guidelines, pursuant to U.S.S.G. §§ 2K2.4(c), 4B1.1(c)(2)(B) and (c)(3).  However, in light of the Second Circuit's holding in United States v. Chappelle, 41 F.4th 102 (2d Cir. July 21, 2022), the government now considers the career offender provisions under the Guidelines to be inapplicable in this case as charged.

5

Lyft vehicle waiting outside, after which the defendant had the Victim withdraw cash from an ATM and give it to the defendant: $250 for what the Victim originally owed, and an additional $130. Before abducting the Victim, however, the defendant made sure to threaten Jane Doe and the small children, stating that if she called the police, he would come back to kill her and her family.

In short, the heinous nature of the offense weighs strongly in favor of a substantial term of imprisonment.

B.  The Defendant's History and Characteristics

The defendant's history and characteristics also weigh in favor of the requested sentence. See 18 U.S.C. § 3553(a). Specifically, the defendant falls into Criminal History Category VI because of his extensive and violent criminal history, which includes convictions in New Jersey State for six felony offenses: (1) an August 2017 conviction for resisting arrest and eluding an officer in the second degree, for which he was sentenced to 465 days' imprisonment; (2) an August 2017 conviction for terroristic threats in the third degree, for which he was sentenced to 96 days' imprisonment; (3) an October 2018 conviction for terroristic threats in the third degree, for which he was sentenced to 69 days' imprisonment; (4) an April 2019 conviction for terroristic threats in the third degree, for which he was sentenced to 364 days' imprisonment; and February 2020 convictions for (5) shoplifting in the third degree, and (6) possession of a controlled substance or its analog in the third degree, for which he was sentenced to 57 days' imprisonment. See PSR ¶¶ 46-47, 50, 52-53. In addition to his felony convictions, the defendant has been convicted as an adult of at least five misdemeanors on separate occasions. Id. ¶ 44-45, 48-49, 51.

On February 25, 2021, several weeks after the home invasion extortion and kidnapping in this case, Montclair Police Department officers responded to a report of a burglary in Montclair, New Jersey. Id. ¶ 16. It was also reported that the individual suspected of the burglary had subsequently left the site of the burglary in the back seat of a silver sedan. Id. When officers arrived at the scene, they stopped a silver taxi matching the description. Id. The taxi's passenger was the defendant. Id.

Following initial questioning, the defendant was removed from the taxi and was frisked. Id. ¶ 17. During the frisk, officers found a small loaded semi-automatic pistol hidden in the defendant's right shoe. Id. The defendant was subsequently arrested and charged for the unlawful possession of a handgun and the possession of prohibited ammunition. Id. Those charges remain pending. Id.

At the time of his February 2021 arrest, and during the instant offense, the defendant was on probation from his October 2018 and April 2019 convictions. Id. ¶ 55. He has been in state or federal custody since his February 2021 arrest. And yet, even being detained has failed to stop the defendant from carrying out additional acts of violence.

6

On August 3, 2021, while in New Jersey State custody, the defendant was arrested for throwing bodily fluid at law enforcement, making terroristic threats, and obstructing the administration of the law. Id. ¶ 58. Those charges are pending. Id.

Following his August 13, 2021 arraignment in this case, the defendant was remanded to federal custody. See Order of Detention, ECF No. 7. Since that time, the defendant has committed additional infractions, including fighting with another person, assault, and refusing to obey an order. See PSR ¶ 86. These infractions began shortly after he was remanded to federal custody and have continued through at least April 6, 2022. Id.

The defendant has spent well over a decade committing crimes or in prison. And those prison sentences have not deterred or rehabilitated him. Rather, as the instant convictions and his recent time in custody demonstrate, the defendant has continued his path of destruction by using extreme violence. Accordingly, a sentence of at least 210 months' imprisonment is appropriate.

C. Reflecting the Seriousness of the Offense, Promoting Respect for the Law and Providing Just Punishment

The requested sentence is also necessary to reflect the seriousness of the offense, promote respect for the law and provide just punishment. 18 U.S.C. § 3553(a)(2)(A). As described above, the seriousness of the offense cannot be overstated and weighs heavily in favor of a significant term of incarceration. Further, the requested sentence is required to promote respect for the law because the defendant committed these crimes after already serving substantial terms of imprisonment and while serving two sentences of probation. In other words, the defendant's repeated violent acts even after numerous brushes with the criminal justice system, and even while in custody, demonstrate a profound disrespect for the law that must be met with significant punishment.

D. Affording Deterrence and Protecting the Public

Finally, the requested sentence is necessary to afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant. 18 U.S.C. §§ 3553(a)(2)(B) and (C).

1. Specific Deterrence

In this case, specific deterrence and incapacitation are critical. Repeated custodial sentences, and lengthy terms of probation did nothing to deter the defendant from committing the instant offense, or the other offenses he has committed since that day. Notably, the level of violence exhibited by the defendant in this case appears to be an escalation from his prior crimes—he beat the Victim so viciously that the Victim nearly died. This clear, documented pattern of sustained, serious and varied criminal acts points to one thing: the defendant is almost certain to recidivate if released from custody prematurely; indeed, his misconduct while in custody is additional evidence of the continuing risk of

recidivism he presents. Therefore, the need to protect the public is of paramount importance, and can only be accomplished here with a significant term of incarceration.

    2.    <u>General Deterrence</u>

The government acknowledges that the Victim used drugs. But that does not make him any less of a victim, or any less deserving of the protection of the law. The Victim reported the defendant's violent assault to the police, and the defendant's horrific conduct that night is detailed above. All victims of crimes should be encouraged to come forward, and those who terrorize people should be on notice that their crimes will be punished. For this reason, the need for general deterrence also weighs in favor of the requested sentence.

V.    <u>Conclusion</u>

Given all of the facts and circumstances discussed above, the government respectfully submits that a sentence within the applicable Guidelines range of 210 to 210 months' imprisonment is appropriate.

        Respectfully submitted,

        BREON PEACE
        United States Attorney

By:    */s/ Garen Marshall*
        Garen S. Marshall
        Assistant U.S. Attorney
        (718) 254-6569

cc:    Clerk of the Court (EK) (by ECF and Email)
        Allegra W. Glashausser, Esq. (by ECF and Email)
        Jameka Bing, United States Probation Officer (by Email)